[Cite as *State v. Thayer*, 2024-Ohio-3050.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2023-10-077 |
| | : | O P I N I O N |
| - vs - | | 8/12/2024 |
| | : | |
| PATRICK NOEL THAYER, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 23CR40675

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Engel & Martin, LLC, and Joshua A. Engel, for appellant.

**BYRNE, J.**

{¶ 1} Patrick Noel Thayer appeals from his convictions in the Warren County Court of Common Pleas for unlawful securities practices, aggravated theft, and identity fraud. Thayer contends that the court erred by declining to merge his convictions for sentencing purposes. For the reasons discussed below, we affirm the trial court's

sentences.

## I. Factual and Procedural Background

{¶ 2}   In June 2023, a Warren County grand jury indicted Thayer on the following counts:

- Count One:  Unlawful Securities Practices in violation of R.C. 1707.44(G), a first-degree felony;

- Count Two: Unlawful Securities Practices in violation of R.C. 1707.44(M)(1)(b), a second-degree felony;

- Count Three: Aggravated Theft in violation of R.C. 2913.02(A)(2) and (B)(2), a second-degree felony;

- Count Four: Telecommunications Fraud in violation of R.C. 2913.05(A) thru (C), a first-degree felony; and

- Count Five: Identity Fraud in violation of R.C. 2913.49(B) and (I)(2), a second-degree felony.

{¶ 3}   The indictment arose after Thayer, while acting as an investment adviser, entered into a professional adviser/client relationship with the victim.  Thayer then secretly used the victim's identity to open a bank account in the victim's name.  Then, over the course of nearly a decade, Thayer liquidated the victim's investments and transferred the proceeds to the fraudulently-opened bank account.  He then used the money in the bank account for personal spending.  In total, Thayer stole approximately $1.3 million from the victim.

{¶ 4}   In August 2023, as a result of a negotiated plea agreement, Thayer agreed to plead guilty to Counts Two, Three, and Five (the second-degree felony counts).  In return, the state agreed to dismiss Counts One and Four.  The court accepted Thayer's plea and found him guilty of the three counts.

{¶ 5}   At sentencing, the court addressed the issue of merger, stating,

First off, Mr. Thayer, we're dealing with three offenses that all evolved or rose out of the same incident.  So the court does

need to at least address the issue of merger. And the court has considered all three offenses and finds that they are offenses of dissimilar import and, therefore, do not merge together for the purposes of sentencing today.

{¶ 6} The court sentenced Thayer on Count Two to an indefinite prison term of a minimum of five years to a maximum of seven-and-one-half years. On Count Three, the court sentenced Thayer to five years in prison. And on Count Five, the court sentenced Thayer to five years in prison. The court ordered Thayer's sentences to be served consecutively, for an aggregate prison sentence of 15 to 17.5 years in prison. Thayer appealed, raising two assignments of error.

## II. Law and Analysis

### A. Allied Offenses

{¶ 7} Thayer's first assignment of error states:

THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO MERGE THE COUNTS FOR SENTENCING PURPOSES.

{¶ 8} In his first assignment of error, Thayer argues that the trial court plainly erred by failing to merge Counts Two, Three, and Five. Thayer argues that all three offenses were not dissimilar in import or significance, were not committed separately, and were not committed with separate animus or motivation.

### 1. Standard of Review

{¶ 9} An appellate court typically reviews de novo the trial court's R.C. 2941.25 merger determination. *State v. Clowers*, 2019-Ohio-4629, ¶ 32 (12th Dist.). However, Thayer concedes that his trial counsel did not object to the court finding that the three counts were of dissimilar import and that he is limited to arguing plain error on appeal.

{¶ 10} But the Ohio Supreme Court has held that the imposition of multiple sentences for allied offenses of similar import *is* plain error. *State v. Underwood*, 2010-

Ohio-1, ¶ 31, citing *State v. Yarbrough*, 2004-Ohio-6087, ¶ 96-102. Accordingly, we conduct the merger analysis de novo.

## 2. The Offenses and Facts in the Record

{¶ 11} We begin with an overview of the three criminal statutes and the evidence in the record related to these offenses.

{¶ 12} Count Two concerns unlawful securities practices in violation of R.C. 1707.44(M)(1)(b). That statute provides:

> No investment adviser or investment adviser representative
> shall do any of the following: . . . Engage in any act, practice,
> or course of business that operates or would operate as a
> fraud or deceit upon any person. . . .

{¶ 13} Regarding this offense, the bill of particulars stated that Thayer was a registered investment adviser with the Ohio Division of Securities between December 6, 2020 and October 3, 2022. It further stated that between these dates, Thayer engaged in illegal or fraudulent practices by "liquidating stocks, bonds, money market funds, equity funds and exchange traded funds" from the victim's account and transferring them to an account at Ally Bank. The value of funds or securities involved in the offense were more than $37,500 but less than $150,000.

{¶ 14} Count Three concerns aggravated theft in violation of R.C. 2913.02(A)(2). That statute provides:

> No person, with purpose to deprive the owner of property or
> services, shall knowingly obtain or exert control over either the
> property or services in any of the following ways: . . . Beyond
> the scope of the express or implied consent of the owner or
> person authorized to give consent. . . .

{¶ 15} Regarding this offense, the bill of particulars stated that between November 2013 and August 2022, "as part of a continuing course of conduct," Thayer obtained the victim's property beyond the scope of her consent by engaging in "illegal or fraudulent

practices[,]" and specifically by "liquidating stocks, bonds, money market funds, equity funds and exchange traded funds" from her account and transferring them to an account at Ally Bank. The value of these assets were approximately $1,310,605.81.

{¶ 16} Count Five concerns identity fraud in violation of R.C. 2913.49(B). That statute provides:

> No person, without the express or implied consent of the other person, shall use, obtain, or possess any personal identifying information of another person with intent to do either of the following:
>
> (1) Hold the person out to be the other person;
>
> (2) Represent the other person's personal identifying information as the person's own personal identifying information.

{¶ 17} Regarding this offense, the bill of particulars stated that between November 1, 2013 thru August 3, 2022, at 129 East Main Street, Lebanon, Ohio, Thayer used, obtained, and possessed the victim's personal identifying information with intent to hold himself out to be the victim and in November 2013, established the Ally Bank account in the victim's name without her knowledge or consent and used this account exclusively to pay personal expenses of himself and his family.

{¶ 18} At the plea hearing, the state indicated that the plea was the result of extensive conversations with the victim and input from the Ohio Division of Securities, who had an attorney investigator present in the courtroom.

{¶ 19} The state presented the following statements of facts at the plea hearing:

> Your Honor, if the State or if this case had proceeded to trial, the State would have proven beyond a reasonable doubt that between November 1, 2013, and August 3, 2022, the Defendant was licensed as a security sales person and then later as an investment advisor. The victim was a client who had trusted her investments with the Defendant in his capacity as a security sales person and an investment advisor.

The Defendant opened a bank account in the victim's name without her knowledge or consent. He forged various documents to effectuate transfers of funds from unauthorized sales of the victim's investments to that bank account. And then in doing so stole $1,310,605.81 from the victim. He used those funds that were transferred to that bank account to pay for his own personal expenses. And all of this occurred in Warren County, Ohio, Your Honor.

Thayer admitted that the statement of facts was true.

{¶ 20} After the plea hearing but before sentencing, the court ordered a level-two presentence-investigative report ("PSI"). The PSI contains the following recitation of facts:

According to documents from the Ohio Department of Commerce, Patrick Thayer was a registered representative on retail brokerage accounts for a resident of Warren County, Ohio, between April 23rd, 2012, and September 4th, 2020. Additionally, Patrick was the registered investment advisor representative on her advisory account from September 4th, 2020, and October 3rd, 2022. On November 13th, 2013, Patrick opened an Ally Bank account, ending in 6310, without the [victim's] knowledge or permission. Following, Patrick began selling securities from the brokerage account and transferring the proceeds of the sales to the Ally Bank account, where he used [the] funds to pay his personal expenses. For example, Patrick used the funds to make a down payment on his former home, he purchased a tiny home for his daughter, his mortgages, a car loan, and his Capital [One] credit card bill. The victim was unaware of the Ally Bank account and any activity until she was contact[ed] by the U.S. Internal Revenue Service in 2022. The victim asked Patrick about the Ally Bank account and he admitted he had been taking money from her. Following, Patrick offered to sell his tax preparation business and his home to [reimburse] the victim.

Patrick was handling the personal tax returns of the victim. From November 26th, 2013, until August 2nd, 2022, Patrick misappropriated $1,310,605.81 from the victim's brokerage account. As of January of 2023, Patrick has [reimbursed] the victim $226,120.68 in restitution.

{¶ 21} The PSI also contains Thayer's handwritten account of his offense:

Beginning in November 2013, as an investment advisor, I

forged and used my client's . . . signature and identity to create a bank account without her knowledge or approval. I syphoned funds from her investment accounts in the amount of $1.3 million over 8.5 years. I used the money for housing, education, helping family members with housing and medical expense, and for my business. In August 2022 I admitted to the victim what I had done and started my own restitution. I sold my home and turned over 100% of the proceeds along with all of my available cash. I attempted to sell my business (just the tax & accounting side), but when the SEC contacted the buyer, the deal fell through and I lost the business. I was hired as a senior accountant, later promoted to financial controller at the Hard Rock Casino in Cincinnati allowing me to make monthly payments.

{¶ 22} The PSI also contains the victim's impact statement, which provides:

This whole crime has been nothing but stressful and time consuming. There have been many sleepless nights wondering how and why this happened to me. I trusted Patrick Thayer and was expecting the money to grow and be used for my family, and our future. I feel violated because he was pretending to be me and got away with it for so long. It makes me angry to think how much of my money he was spending while I'm thinking it was being invested.

{¶ 23} At sentencing, the victim stated the following,

I first met Patrick Thayer years ago when he became my accountant. I really appreciated how helpful and easy he was to talk to. When he mentioned that he also did financial planning, I thought perfect because I believe Patrick would definitely have my best interest.

So in 2013 Patrick Thayer began investing my money and helping me plan for my future, so I thought. The money Patrick was supposed to invest came mostly from my father in the form of stock. Patrick knew how important that money was to me and how I never wanted to use it unless I really needed it.

Whenever I needed to use some, Patrick would always assure me that there would still be enough for my future. Now, I wasn't the best at checking my statements because raising two daughters, going through breast cancer, helping my aging parents, who have since passed. And in 2022 helping my oldest daughter during her treatment for ovarian cancer. I also didn't think I needed to check every statement because I assumed Patrick had everything under control.

If I ever questioned a loss on an account, Patrick would just tell me that the market was down, and I believed him. Well, in August 2022 after I dropped my daughter off for her first week of chemo, I found out that Patrick Thayer, someone I trusted, had been stealing my money from me for several years.

As a matter of fact, he started the very first year he became my financial planner. How could he do that to me and why? It took me several months to figure out how Patrick took my money without me knowing. It was not easy to learn. And how could he hide and—it wasn't easy to learn, and how he could hide the money he stole. I couldn't believe that he had the nerve to set up a bank account in my name the very first month he became my financial planner.

Patrick obviously planned on stealing my money from day one. He also made phone calls pretending to be me so he could just sell my stock and use it to his benefit. And he put it in a bank account that, once again, he opened up. Who does that? I just couldn't believe he did that. I have lost so much sleep over this. I'm embarrassed by this. I'm angry and I'm hurt. I thought Patrick was someone I could trust and considered to be a friend.

I feel that he did not care how this would affect me and he only thought of himself. This entire process is so stressful and it just shouldn't have happened. If Patrick doesn't pay me back, then he needs to be held accountable somehow. Thank you.

### 3. Double Jeopardy and the Law on Allied Offenses

{¶ 24} Both the Ohio Constitution and the United States Constitution "prohibit the government from subjecting a person to multiple punishments for the same offense." *State v. Herzner*, 2021-Ohio-4244, ¶ 10 (12th Dist.), citing *State v. Ruff*, 2015-Ohio-995, ¶ 10. The double jeopardy provision in Article I, Section 10 of the Ohio Constitution states, "No person shall be twice put in jeopardy for the same offense." The double jeopardy provision of the Fifth Amendment to the United States Constitution states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb . . . ." The federal double jeopardy clause applies to Ohio citizens through the Fourteenth

Amendment to the United States Constitution. *Benton v. Maryland*, 395 U.S. 784, 794 (1969). After citing both constitutional provisions, the Ohio Supreme Court in *Ruff* explained that "[t]he Double Jeopardy Clause protects against three abuses: (1) 'a second prosecution for the same offense after acquittal,' (2) 'a second prosecution for the same offense after conviction,' and (3) 'multiple punishments for the same offense.'" *Ruff* at ¶ 10, quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969).

{¶ 25} The state and federal constitutional protection against the third abuse—multiple punishments for the same criminal offense—is codified in R.C. 2941.25, Ohio's allied-offenses statute. *State v. Conrad*, 2018-Ohio-5291, ¶ 43 (12th Dist.). The allied offense statute provides:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25.

{¶ 26} Stated more simply, R.C. 2941.25 provides that in determining whether offenses are "allied" and therefore must be merged for sentencing, courts are instructed to consider three separate factors: the conduct, the animus, and the import. *State v. Singh*, 2021-Ohio-2158, ¶ 60 (12th Dist.), citing *Ruff*, 2015-Ohio-995 at paragraph one of the syllabus. A defendant may be convicted of multiple offenses arising out of an episode of criminal conduct if: "1) the offenses did not have the same import, i.e. the offenses created separate, identifiable harms; 2) the offenses were committed separately; or 3) there was a separate animus or motivation in committing the offenses." *Clowers*, 2019-

Ohio-4629 at ¶ 30, citing *Ruff* at ¶ 25. If the answer to any of these three inquiries is "yes," then the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses. *See State v. Williams*, 2018-Ohio-4261, ¶ 9 (12th Dist.). The critical inquiry for an analysis under R.C. 2941.25 is the conduct of the defendant. *Clowers* at ¶ 30, citing *Ruff* at ¶ 26.

### 4. Merger Analysis

### a. Import

{¶ 27} "The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import." *Ruff* at ¶ 26. If multiple offenses were perpetrated against a single victim, the defendant may be convicted of the different offenses if the victim suffers separate and identifiable harm from the different offenses. *Clowers*, 2019-Ohio-4629 at ¶ 30, citing *Ruff* at ¶ 26. Based on the evidence in the record, including the evidence presented at the plea hearing, the PSI, and the sentencing hearing, we find that Thayer's three offenses were of dissimilar import.

{¶ 28} The harm suffered by the victim based on Thayer having committed aggravated theft is obvious and not controversial. The victim lost over a million dollars of her assets.

{¶ 29} The harm caused by the aggravated theft is separate and identifiable from the harm caused to the victim by Thayer's conduct constituting unlawful securities practices. That offense concentrates on Thayer's status as a licensed investment adviser and engaging in a deceitful "act, practice, or course of business" during that financial adviser/client relationship.

{¶ 30} At sentencing, the victim described how Thayer began helping her by providing professional accounting services. She explained that when she learned he also provided financial planning services, she thought this was "perfect" and believed that

Thayer would "definitely have my best interest."  She believed in 2013 that he began investing her assets and helping her plan for her future.

{¶ 31} The record reflects that Thayer's conduct related to unlawful securities practices involved entering into the adviser/client relationship knowing that he intended to use that relationship in order to deceive the victim (which can be reasonably ascertained given how quickly he moved to open the fraudulent bank account in the victim's name).  Thayer then acted deceitfully by forging documents to sell the victim's assets instead of investing them, and then hiding the proceeds.  Throughout the course of his business with the victim, Thayer repeatedly lied to the victim by telling her that her investments would "be enough for [the victim's] future."  And Thayer acted deceitfully when he lied to the victim by telling her that unexpected losses in her accounts were due to market fluctuations.  Thayer's actions related to unlawful securities practices harmed the victim in that they ensured the victim kept Thayer in charge of her investments over the course of the scheme and prevented the victim from uncovering the theft offense and preventing further loss.  His actions also harmed the victim in that they prevented the victim from accumulating investment returns over the course of the scheme.

{¶ 32} Moreover, Thayer's unlawful securities practices created separate and identifiable harm because they violated and undermined the regulatory scheme set forth in Chapter 1707 of the Ohio Revised Code.  Chapter 1707 defines an "investment adviser" as,

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as a part of regular business, issues or promulgates analyses or reports concerning securities.

R.C 1707.01(X)(1).

{¶ 33} Under R.C. 1707.141, no person is permitted to act as an investment adviser and conduct business in Ohio unless that they have been licensed as an investment adviser by the Ohio Division of Securities or they are registered under the federal Investment Advisers Act of 1940.[1] Chapter 1707 generally sets forth the licensing and registration laws applicable to investment advisers and others subject to regulation under the Chapter. The Chapter further provides the Ohio Division of Securities with regulatory oversight over investment advisers. *See* R.C. 1701.01 thru 1701.99. The statutory framework of Chapter 1707 demonstrates that the state has a strong interest in regulating investment advisers because the potential for financial abuse—as seen here— is so great.

{¶ 34} Thayer had the victim's trust and access to her assets. This trust was largely premised on the fact that Thayer was licensed by the state to act as an investment adviser. Thayer's conduct undermined the victim's trust in licensed financial advisers, it undermined the general public's trust in licensed financial advisers, and it undermined the state's licensing and regulatory process. In that final regard, Thayer's conduct in this case was so serious that the Ohio Division of Securities participated in the investigation and was substantially involved in plea negotiations. A representative of the Division also attended Thayer's sentencing.

{¶ 35} The harms described above are also separate and identifiable from the harm caused by Thayer's actions in stealing the victim's identity. At oral argument, Thayer contended that the identity theft crime—that is, opening the fraudulent bank account— caused the victim no harm and that it was only when the money was taken and spent from the bank account that the victim suffered any actual harm. We disagree.

---

1. There are other exceptions listed in this statute, mainly pertaining to out-of-state investment advisers or charitable organizations, which are irrelevant here.

{¶ 36} There is no doubt that an identity has value. In the case of public figures, an identity, and the associated branding and licensing rights, can be worth millions. But for the ordinary citizen, an identity also has significant value because personal identifying information can be used as a tool to commit any number of fraudulent actions, such as opening an unauthorized bank account or line of credit. The time and effort involved in straightening out the financial impact of a case of identity theft can be extraordinary, and the impact may continue far into the future. Ordinary citizens pay for identity-theft monitoring services for this very reason.

{¶ 37} In this case, before committing the aggravated theft of the victim's funds, Thayer used his access to the victim's personal identifying information to open the Ally Bank account. The act of using the victim's identity to open a fraudulent bank account caused the victim separate and identifiable harm because the victim never authorized the opening of the account, never had knowledge of the account, and never had access to or control over the account. But of course the account was still in her name. Had she had access to this account, she could have used the money or at least been aware of how the money was being spent.

{¶ 38} In his appellate brief, Thayer focuses his import argument on the fact that there was only one victim and argues that "Two or more offenses are most commonly found to be dissimilar in import when the offenses involve separate victims. *Ruff*, 2015-Ohio-995 at ¶ 23." Thayer contends that there was only one victim and all three offenses were part of a single scheme to steal money from the victim.

{¶ 39} However, while the court in *Ruff* did state that offenses are of dissimilar import where there are multiple victims, the court also stated that in case of a single victim, offenses are of dissimilar import where the harm of each offense is separate and identifiable:

What we conclude from these cases is that two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims *or if the harm that results from each offense is separate and identifiable.*

(Emphasis added.) 2015-Ohio-995 at ¶ 23.

{¶ 40} As set forth above, we have found that each offense caused separate and identifiable harm.

**b. Separate Offenses**

{¶ 41} We also conclude that Thayer committed the offenses separately. This court has previously held that if one offense is completed before the other begins, then "the offenses are considered separately for sentencing purposes even though the two offenses may have been committed in close proximity in time." *State v. Fields*, 2015-Ohio-1345, ¶ 18 (12th Dist.).

{¶ 42} The record indicates that Thayer completed each offense at different times. The identity theft offense was completed when Thayer opened the fraudulent bank account at Ally Bank in November of 2013. Thayer completed the offense of unlawful securities practices through his ongoing efforts between November 2013 and August 3, 2022, to deceive the victim and keep her as a client, by failing to invest her money and instead selling her investments, by transferring the proceeds of her investments to a fraudulent bank account, and by continually lying to her about the status of her investments. Thayer completed the theft offense separately from the conduct constituting unlawful securities practices, at the various times that Thayer spent the money in the Ally Bank account on his own personal spending.

{¶ 43} Because all three offenses were of dissimilar import and were also committed separately, the trial court was not required to merge the offenses for sentencing. And, therefore, we are not required to consider the final step of the *Ruff*

analysis and determine whether the offenses were committed with a separate animus or motivation.[2]  *See Williams*, 2018-Ohio-4261 at ¶ 9; *see also State v. Conrad*, 2019-Ohio-263, ¶ 40 (4th Dist.).

### c. Whether a "Scheme" to Steal Required the Offenses to Merge

**{¶ 44}** Thayer argues that his three offenses were part of a scheme to transfer funds into a separate bank account and spend that money.  He argues "Courts have found that offenses arising out of a scheme to transfer funds into a separate bank account were allied offenses" and cites cases in support.

**{¶ 45}** Thayer cites *State v. Marneros*, 2015-Ohio-2156 (8th Dist.), for the proposition that theft and forgery offenses committed as part of a scheme were required to merge.  In *Marneros*, the defendant pled guilty to theft and forgery and was sentenced for both counts.  *Id*. at ¶ 4.  On appeal, he argued that those offenses should have been merged and the state conceded error.  *Id*. at ¶ 39.  In finding that the offenses should merge, the Eighth District Court of Appeals noted that the only facts in the record were from the police summary in the PSI.  *Id*. at ¶ 42.  That summary noted that multiple checks had been deposited into the defendant's account and all the checks appeared to be written by the victim to the defendant.  There were a total of seven checks, all over $400, and totaling $7,685.  The victim denied writing the checks to the defendant.  *Id*.

**{¶ 46}** The court found that the offenses should merge because,

> the harm that resulted from each offense was the same, the offenses occurred simultaneously, as a result of the same conduct, and arose from the same animus.  [The defendant] committed the crime when he presented the checks to the bank and received, in return, the victim's money deposited into his account.  The passing (or "uttering") of the checks was the forgery offense, and his receipt of money into his account was the theft offense.

---

2. The state did not argue that Thayer possessed a different animus for all three offenses and presumably concedes that Thayer's animus was the same for his offenses.

*Id*. at ¶ 44.

{¶ 47} *Marneros* is distinguishable from the case on appeal because the forgery and theft offenses occurred simultaneously and the harm from forging the checks was the same harm that resulted in the theft offense. As set forth previously, under the facts of this case, the harm that resulted from Thayer's identity theft, unlawful securities practices, and theft offenses were separate and identifiable from each other. Moreover, each offense was committed at separate times.

{¶ 48} Thayer also cites *State v. Snyder*, 2011-Ohio-6346 (12th Dist.), in which this court found that a count of grand theft by deception and three counts of passing bad checks were allied offense of similar import. *Id*. at ¶ 33. In *Snyder*, the defendant contracted with the victim, a company, to purchase steel studs. *Id*. at ¶ 2. After the company shipped the studs, the defendant paid with a series of three bad checks. *Id.* This court held that the state prosecuted the grand theft by deception count as a "continuing course of conduct" and that "[i]t is readily apparent from the statement of facts provided by the state at Snyder's plea acceptance hearing that the state was prosecuting Snyder for the same conduct in [the grand theft indictment] that it was prosecuting him for in [the three counts of passing bad checks]." *Id*. at ¶ 23.

{¶ 49} First, we note that *Snyder* was decided before *Ruff*. Therefore, the analysis set forth in *Snyder* is not the same we are required to use today in deciding this case. Regardless, we do not find *Snyder* instructive. In *Snyder*, there was no separate harm associated with the passage of the bad checks other than the grand theft that occurred directly as a result of the checks not being honored. But, as set forth above, each of Thayer's offenses caused separate and identifiable harm.

{¶ 50} On the basis of the foregoing analysis, Thayer has not demonstrated that

the trial court committed any error in failing to merge his offenses before sentencing. We overrule Thayer's first assignment of error.

## B. Ineffective Assistance of Counsel

{¶ 51} Thayer's second assignment of error states:

TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO OBJECT TO THE TRIAL COURT'S FAILURE TO MERGE THE COUNTS FOR SENTENCING PURPOSES.

{¶ 52} In Thayer's second assignment of error, he argues that his trial counsel provided constitutionally defective assistance of counsel by failing to object to the court's refusal to merge his offenses. He argues that if his counsel had objected at trial, the court would have merged the offenses, resulting in a different sentencing outcome.

{¶ 53} The test for ineffective assistance of counsel requires a defendant to prove (1) "that counsel's performance was deficient[,]" and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In reviewing a claim of ineffective assistance of counsel, we examine whether counsel's acts or omissions "were outside the wide range of professionally competent assistance" while "recogniz[ing] that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. To establish the second element of prejudice, the defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

{¶ 54} Based on our resolution of Thayer's first assignment of error, this assignment of error is rendered moot and we need not address it. App.R. 12(A)(1)(c).

{¶ 55} Judgment affirmed.

S. POWELL, P.J., and PIPER, J., concur.

- 17 -